Mike MORATH, Commissioner
of Education, Petitioner,

v.

STERLING CITY INDEPENDENT
SCHOOL DISTRICT, Highland Inde-
pendent School District, and Black-
well Consolidated Independent School
District, Respondents

NO. 14–0986

Supreme Court of Texas.

Argued December 9, 2015

Opinion delivered: June 24, 2016

Rehearing Denied September 23, 2016

Beth Ellen Klusmann, Assistant Solicitor General, Office of the Attorney General, Daniel T. Hodge, First Asst. Attorney General, Greg W. Abbott, Attorney General of Texas, Jonathan F. Mitchell, Solicitor General, Office of the Attorney General, Nichole Beth Bunker-Henderson, Assistant Attorney General, Shelley Nieto Dahlberg, Office of the Attorney General Austin TX, for Mike Morath, Commissioner of Education.

Kevin T. O'Hanlon, Leslie L. McCollom, O'Hanlon McCollom & Demerath, Austin TX, for Sterling City Independent School District, Highland Independent School District, and Blackwell Consolidated Independent School District.

CHIEF JUSTICE HECHT announced the judgment of the Court and delivered an opinion, in which JUSTICE GREEN, JUSTICE LEHRMANN, and JUSTICE DEVINE joined.

Section 42.2516 of the Texas Education Code[1] requires the Commissioner of Education to make certain adjustments in state aid to school districts and provides that his determinations are "final and may not be appealed."[2] In this *ultra vires* action, three school districts complain that the Commissioner exceeded his authority under the statute. We hold that the Legislature has made the decisions of which the districts complain beyond judicial review. We therefore reverse the judgment of the court of appeals[3] and dismiss the case for want of jurisdiction.

Texas public schools are funded largely by local ad valorem taxes and also by the State through the Foundation School Program ("FSP"). Texas has over 1,000 school districts, and local tax revenues vary widely among them. To reduce the disparities, the FSP provides state funding to property-poor districts and "recaptures" local revenue from property-rich districts.

For the past 30 years, school districts have complained that the FSP has not sufficiently equalized funding and have repeatedly challenged the public school finance system as being inefficient, inadequate, and unsuitable in violation of Article VII, Section 1 of the Texas Constitution.[4]

---

1. TEX. EDUC. CODE § 42.2516.

2. *Id.* § 42.2516(h) (codified until 2009 as § 42.2516(*l*)); Act of June 1, 2009, 81st Leg., R.S., ch. 1328, § 57, 2009 Tex. Gen. Laws 4173, 4194 [HB 3646], *amending* Act of May 12, 2006, 79th Leg., 3d C.S., ch. 5, § 1.04, 2006 Tex. Gen. Laws 45, 48–49 [HB 1].

3. 447 S.W.3d 505 (Tex.App.–Eastland 2014).

4. *Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d 391 (Tex.1989); *Edgewood Indep. Sch. Dist. v. Kirby,* 804 S.W.2d 491 (Tex.1991); *Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.,* 826 S.W.2d 489 (Tex.1992); *Edgewood Indep. Sch. Dist. v.*

The FSP's efforts to equalize funding among the districts by limiting local tax rates have also prompted challenges that the FSP operates as a statewide property tax prohibited by Article VIII, Section 1–e of the Texas Constitution.[5] We agreed with that challenge in *Neeley v. West Orange–Cove Consolidated Independent School District.*[6]

Following *Neeley*, the Legislature in 2006 enacted House Bill 1 ("HB 1"), overhauling the FSP.[7] The FSP is extremely complex, and its funding formulas are elaborate. We described it in some detail earlier this Term in the latest case involving challenges to its constitutionality.[8] Here we need only set out more generally the parts that are important to this case.

HB 1 retained the FSP's basic structure. Two of its components, referred to as the basic allotment and guaranteed level, determine the level of FSP funding a district receives.[9] A third component, the equalized wealth level, a product of the basic allotment, is a statutory maximum value of local taxable property per student in weighted average daily attendance ("WADA"). The equalized wealth level is used in determining recapture.[10] Together, these three components, with other relatively minor considerations, operate to determine a district's per-WADA funding.

One facet of the extensive HB 1 changes, Section 42.2516, replaced limitations on local tax rates with a "compression" mechanism, lowering tax rates by one-third.[11] To "blunt the short-term effects of tax compression" on school districts,[12] the statute included a "hold harmless" mechanism[13] that is due to expire in 2017.[14] For any school district whose funding under statutory formulas did not reach a stated target revenue, the FSP would make up the difference.[15] By the same token, if a district's per-student revenue exceeded its target revenue as a result of formula increases in its equalized wealth level, basic allotment, and guaranteed lev-

Meno, *917 S.W.2d 717 (Tex.1995);* W. Orange–Cove Consol. Indep. Sch. Dist. v. Alanis, *107 S.W.3d 558 (Tex.2003);* Neeley v. W. Orange–Cove Consol. Indep. Sch. Dist., *176 S.W.3d 746 (Tex.2005);* Morath v. Tex. Taxpayer & Student Fairness Coal., *490 S.W.3d 826, 2016 WL 2853868 (Tex.2016).*

5. *Meno,* 917 S.W.2d at 737–738; *Neeley,* 176 S.W.3d at 751, 794–798 (appeal after remand in *Alanis,* 107 S.W.3d at 563, 586); *Tex. Taxpayer & Student Fairness Coal.,* 490 S.W.3d at 841.

6. *Neeley,* 176 S.W.3d at 754, 794–798.

7. Act of May 12, 2006, 79th Leg., 3d C.S., ch. 5, 2006 Tex. Gen. Laws 45 [HB 1].

8. *Tex. Taxpayer & Student Fairness Coal.,* 490 S.W.3d at 863.

9. *Id.*

10. *Id.*

11. Act of May 12, 2006, 79th Leg., 3d C.S., ch. 5, § 1.04, 2006 Tex. Gen. Laws 45, 46–49 [HB 1] (formerly Tex. Educ. Code § 42.2516(a), (a–1)).

12. *Tex. Taxpayer & Student Fairness Coal.,* 490 S.W.3d at 838.

13. Act of May 12, 2006, 79th Leg., 3d C.S., ch. 5, § 1.04, 2006 Tex. Gen. Laws 45, 47 [HB 1] (formerly Tex. Educ. Code § 42.2516(b), (c)); *see Tex. Taxpayer & Student Fairness Coal.,* 490 S.W.3d at 838.

14. Act of June 28, 2011, 82d Leg., 1st C.S., ch. 4, §§ 57.18, .32(a)(2), .34, 2011 Tex. Gen. Laws 5254, 5316, 5319 [SB 1]; Act of May 29, 2015, 84th Leg., R.S., ch. 448, § 6, 2015 Tex. Gen. Laws ——, —— [HB 7]; *see Tex. Taxpayer & Student Fairness Coal.,* 490 S.W.3d at 838 ("[Additional State Aid for Tax Reduction under Section 42.2516] is presently only about 1% of total FSP funding, and is set to expire in 2017.").

15. *Tex. Taxpayer & Student Fairness Coal.,* 490 S.W.3d at 838.

el, a "Clawback Provision" required the Commissioner to take steps to recover the excess. The provision, since repealed, stated:

Notwithstanding any other provision of this title, if the amount of state and local revenue per student in weighted average daily attendance for the maintenance and operations of the district available to the district in a school year as a result of increases to the equalized wealth level under Section 41.002, the basic allotment under Section 42.101, and the guaranteed level under Section 42.302 made by [HB 1], exceeds the amount to which a district is entitled under Subsection (b) for that school year, the commissioner must:

(1) reduce the amount of state aid provided to the district for that school year by an amount equal to the excess revenue, as determined by the commissioner; or

(2) for a district with a wealth per student greater than the applicable amount described by Section 41.002(a), require the district to purchase a number of attendance credits for that school year at a cost equal to the amount of excess revenue, as determined by the commissioner.[16]

Section 42.2516 also included a "Finality Provision" which stated: "A determination by the commissioner under this section is final and may not be appealed."[17] The Legislature has included such provisions throughout the FSP.[18]

While the "hold harmless" provisions were in effect, the Commissioner applied the Clawback Provision to five school districts that had experienced a revenue increase above their target levels, partly due to the operation of the FSP under HB 1 but also from higher tax revenues due to a rise in property values.[19] For these districts, in the first year HB 1 was operative, per-WADA actual revenue was nearly twice per-WADA target revenue. Only three of the districts are parties to the appeal now before us. The following table shows for each their per-WADA target revenue as compared to their per-WADA actual revenue:

---

**16.** Act of May 12, 2006, 79th Leg., 3d C.S., ch. 5, § 1.04, 2006 Tex. Gen. Laws 45, 48 [HB 1] (formerly Tex. Educ. Code § 42.2516(h)), *repealed by* Act of June 1, 2009, 81st Leg., R.S., ch. 1328, § 57, 2009 Tex. Gen. Laws 4173, 4194 [HB 3646].

**17.** Act of May 12, 2006, 79th Leg., 3d C.S., ch. 5, § 1.04, 2006 Tex. Gen. Laws 45, 49 [HB 1] (formerly Tex. Educ. Code § 42.2516(*l*)), *amended by* Act of June 1, 2009, 81st Leg., R.S., ch. 1328, § 57, 2009 Tex.

Gen. Laws 4173, 4194 [HB 3646] (redesignated as Tex. Educ. Code § 42.2516(h)).

**18.** Tex. Educ. Code §§ 42.2513(b), .25161(c), .2518(d), .252(b), .2521(c), .2523(d), .2524(j), .260(d).

**19.** The five school districts are just west of Abilene in Coke, Nolan, Scurry, Sterling, and Taylor Counties. Their property value increases were due mostly to new wind farm operations.

| District | Per-WADA Revenue | |
|---|---|---|
| | Target | Actual |
| Sterling City ISD | $6,650 | $9,382 |
| Blackwell CISD | $7,624 | $13,403 |
| Highland ISD | $5,889 | $11,155 |

Concerned that the funding in these districts would be so much greater than in other school districts, the Commissioner applied the Clawback Provision to them.

The total clawback amounts determined by the Commissioner and the parts attributable to the FSP as distinguished from revenue increases are shown in this table:

| District | Clawback | | |
|---|---|---|---|
| | Total | FSP | Revenue |
| Sterling City ISD | $1,037,994 | $605,260 | $432,734 |
| Blackwell CISD | $1,744,052 | $624,929 | $1,119,123 |
| Highland ISD | $1,743,959 | $289,083 | $1,454,876 |

These three Districts [20] sued the Commissioner for a declaratory judgment that he had exceeded his authority under the Clawback Provision and thus acted *ultra vires*. They asserted that the Clawback Provision applied only to excess revenues above target revenues resulting from the operation of HB 1–that is, from the three components listed in the provision: the equalized wealth level, the basic allotment, and the guaranteed level. The Commissioner did not dispute that part of the excess amounts he sought to recover did not result from the three FSP components listed in the Clawback Provision but contended he had broader authority to ensure that district revenues did not exceed target amounts. He argued that his determinations were consistent with, and even necessary to, the proper operation of the FSP. In any event, the Commissioner asserted, the Finality Provision precluded judicial review, and the trial court therefore lacked jurisdiction over the Districts' claim. The trial court denied the Commissioner's plea to the jurisdiction and granted the Districts' requested declaratory relief, plus attorney fees and costs.[21] The

20. Two more school districts, Robert Lee Independent School District and Hermleigh Independent School District, intervened to bring claims under a different statute, but the trial court ruled against them, and those claims are not on appeal.

21. The Districts also alleged that the Commissioner's interpretation of the Clawback Provision violated *Carrollton–Farmers Branch Independent School District v. Edgewood Independent School District*, 826 S.W.2d 489 (Tex. 1992), in that this interpretation exercised too much control over the local tax levy with-

court of appeals affirmed, holding that the Commissioner had acted *ultra vires* and therefore the Finality Provision was inapplicable.[22]

We granted the Commissioner's petition for review.[23]

■■■ For well over 150 years, we have recognized the Legislature's authority to limit judicial review of executive actions. In 1859, we explained: "No principle is more firmly established, than that where a special and exclusive authority, is delegated to any tribunal or officer of the government, and no mode of revising his decision, by appeal or otherwise, is provided by law, his action is final and conclusive, of the matter submitted to his decision." [24] This principle was added to the Texas Constitution in 1985.[25] Article V, Section 8 gives district courts general jurisdiction "except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body." [26] The Legislature's power to limit judicial review of executive action is not unlimited. Judicial review of claimed violations of constitutional rights and infringement of vested property rights cannot be foreclosed.[27] But in other instances the Legislature may

---

out the authorization of local voters, and thus violated Article VII, Section 3, and Article VIII, Section 1-e, of the Texas Constitution. The trial court observed that the Districts did not challenge the statute as being unconstitutional on its face, and, because the court found that the Commissioner violated the statute, concluded that it did not need to reach the constitutional issue. Nonetheless, the trial court later expressly addressed the Districts' contentions that the Commissioner's demand violated Articles VII § 3 and VIII § 1-e, framing the question as "whether the statute is an unconstitutional exercise of control over local discretion" and holding that, because the court "found that the Commissioner acted within his statutory authority in offsetting excess local revenues against state revenues that were due to the district, the statute does not interfere with local discretion." The Districts did not appeal.

**22.** 447 S.W.3d 505, 513. (Tex.App.–Eastland 2014).

**23.** 59 Tex. Sup.Ct. J. 7 (Oct. 9, 2015).

**24.** *Keenan v. Perry*, 24 Tex. 253, 261 (1859).

**25.** *See* Tex. S.J. Res. 14, § 4, 69th Leg., R.S., 1985 Tex. Gen. Laws 3355, 3357.

**26.** Tex. Const. art. 5, § 8. *See also Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 75 (Tex.2000) ("By statute, district courts have 'the jurisdiction provided by Article V, Section 8, of the Texas Constitution,' Tex. Gov't Code § 24.007, and 'may hear and determine any cause that is cognizable by courts of law or equity and may grant any relief that could be granted by either courts of law or equity.' "); *cf. In re Entergy Corp.*, 142 S.W.3d 316, 321 (Tex. 2004) ("An agency has exclusive jurisdiction when the Legislature has granted that agency the sole authority to make an initial determination in a dispute.").

**27.** *See, e.g., In re Office of Att'y Gen.*, 456 S.W.3d 153, 157 (Tex.2015) ("It is well settled that trial courts may review an administrative action only if a statute provides a right to judicial review, or the action adversely affects a vested property right or otherwise violates a constitutional right."); *Hous. Mun. Emps. Pension Sys. v. Ferrell*, 248 S.W.3d 151, 158 (Tex.2007) ("There is no right to judicial review of an administrative order unless a statute explicitly provides that right or the order violates a constitutional right."); *Stone v. Tex. Liquor Control Bd.*, 417 S.W.2d 385, 385–386 (Tex.1967) ("It is well settled that there is no right of appeal from an administrative order unless the statute provides for the same or unless the order violates a constitutional right or adversely affects a vested property right."); *City of Amarillo v. Hancock*, 150 Tex. 231, 239 S.W.2d 788, 790 (1951) ("Judicial review of administrative action may be specifically provided, or specifically denied by the legislature[, but even when] the legislature specifically denies judicial review, decisions of an administrative body may be attacked in court if they violate some provision of the State or Federal Constitution." (citations omitted)).

make an executive's actions final.[28]

The Districts argue that the Finality Provision precludes only an appeal from the Commissioner's determinations under Section 42.2516, not an *ultra vires* suit to declare his determinations invalid. But the provision also makes the Commissioner's determinations final. In *Houston Municipal Employees Pension System v. Ferrell*, we stated that "[t]he words 'final and binding,' when used to describe an administrative decision, preclude judicial review."[29] The same is true of the word "final" alone. The Districts argue that *Ferrell* holds only that legislatively prescribed finality for an executive decision precludes review for an abuse of discretion, not for a statutory violation. The Districts contend that the Commissioner did not merely abuse his discretion in recovering revenue exceeding target levels for any reason other than the three listed in the Clawback Provision; rather, they contend, the Commissioner exceeded his authority under the statute.

The effect of a statute making an executive determination final is to broaden the executive's discretion. The Districts point to Justice Brister's concurring opinion in *Ferrell*, raising the possibility that, notwithstanding a statute making an executive decision final, an agency's clear violation of a governing statute might be subject to judicial review.[30] The Court itself has not endorsed that view, but in *Klumb v. Houston Municipal Employees Pension System*, a case involving the same agency and the same statutes as in *Ferrell*, we assumed without deciding that Justice Brister's suggestion might be correct and proceeded to conclude that the pension board had not abused its discretion.[31] We stated, however, that an *ultra vires* challenge to executive action made final by statute could not be brought absent a "manifest", "conspicuous and irreconcilable" conflict between the action and the statutory authority asserted by the executive.[32] The Court has never allowed a challenge to an executive decision made final by statute.

The Clawback Provision *required* the Commissioner to recover revenue exceeding target levels because of the operation of the FSP under HB 1 but did not prohibit him from recovering revenue that for other reasons exceeded target levels. The Districts argue that the authority conveyed by the provision was exclusive. The Commissioner concedes that the Districts' interpretation of the statute is reasonable and might prevail absent the Finality Pro-

---

**28.** The Districts argue that if Section 42.2516 gave the Commissioner the unreviewable authority he claims to interpret and apply the Clawback Provision, this statute would be an unconstitutionally broad delegation of legislative power in violation of the constitutional provision for separation of powers. *See Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 467 (Tex.1997). But the FSP is very detailed, and the Commissioner asserts no authority to act inconsistently with the school funding system it establishes. The nondelegation doctrine is not implicated.

**29.** 248 S.W.3d at 158.

**30.** *Id.* at 160 (Brister, J., concurring) ("A different case might be presented if the plaintiffs alleged the board was clearly violating some provision of the statute. [The statute] gives the pension board complete discretion to interpret the statute, but not violate it.... But the plaintiffs argue only that the board is misinterpreting the statute, a charge we cannot adjudicate without interpreting the statute ourselves.").

**31.** 458 S.W.3d 1, 9 (Tex.2015) ("[W]e will assume for purposes of our analysis that the *ultra vires* doctrine is an exception to [the statute]'s ban on judicial review." (citing *Ferrell*, 248 S.W.3d at 160 (Brister, J., concurring))).

**32.** *Id.* at 10–11.

vision. But the Commissioner argues that because his determinations under Section 42.2516 are final, he has the authority to prevent school districts from exceeding target revenue inconsistent with the FSP. In these circumstances, we agree. The FSP is a complex system that must operate within constitutional boundaries. The "hold harmless" provisions of Section 42.2516 were designed to operate for only a few years. The Commissioner was legitimately concerned that the revenue levels experienced by the Districts trespassed those boundaries. Though the Districts' funding in excess of target levels for one year certainly posed no threat to the system as a whole, the Commissioner's determination to treat those districts like all other school districts is not a conflict with Section 42.2516, much less a manifest, conspicuous, and irreconcilable conflict. On the contrary, the Commissioner's determination was consistent not only with Section 42.2516 but with the FSP as a whole. To allow the Districts' challenge in these circumstances would circumvent the Legislature's plain limitation on judicial review.

\* \* \* \* \*

The Finality Provision precludes the Districts' challenges to the Commissioner's decision to recover revenue from them under the Clawback Provision. The trial court therefore lacked jurisdiction to hear the Districts' *ultra vires* suit. Accordingly, we reverse the court of appeals' judgment and dismiss the case for want of jurisdiction.

JUSTICE BROWN, concurring.

I agree with the dissent that "the Commissioner's decision to clawback several million dollars from the [D]istricts was not a determination authorized by . . . section 42.2516" of the Education Code, and thus "the [D]istricts' claims were for *ultra vires*

acts of the Commissioner." *Post* at 420. However, because I also agree with the plurality that "[t]he Finality Provision precludes the Districts' challenges to the Commissioner's decision," *ante* at 414, I concur in the judgment.

**I**

As discussed by the plurality, the dispute in this case arises from the Commissioner of Education's decision to clawback excess revenue from several school districts ("Districts") pursuant to former section 42.2516(h) of the Education Code ("Clawback Provision"). The Clawback Provision requires the Commissioner to "reduce the amount of state aid provided to [a] district . . . by an amount equal to the excess revenue, as determined by the commissioner" when the "amount of state and local revenue per student . . . exceeds the amount to which a district is entitled . . . for [the] school year" as a consequence "of increases to the equalized wealth level . . ., the basic allotment . . ., and the guaranteed level." TEX. EDUC. CODE § 42.2516(h) (2006). Here, the Commissioner concedes that his determination of "excess revenue" was based in large part on increases in the Districts' tax revenues. As "tax revenue" is not one of the three categories listed in the statute, the Districts allege the Commissioner acted *ultra vires*.

**A**

We said in *Houston Belt & Terminal Railway v. City of Houston* that "governmental immunity bars suits complaining of an exercise of *absolute* discretion but not suits complaining of . . . an officer's exercise of . . . *limited* discretion without reference to or in conflict with the constraints of the law authorizing the official to act." 487 S.W.3d 154, 163 (Tex.2016). Without much discussion, the plurality concludes

that "[t]he Clawback Provision ... did not prohibit [the Commissioner] from recovering revenue that ... exceeded target levels" for reasons other than increases to the equalized wealth level, basic allotment, and guaranteed level. *Ante* at 413. But as the dissent points out, by enumerating three specific categories, the plain language of section 42.2516(h) operates to "limit[ ] the Commissioner's discretion as to what he *may* consider" when recovering excess revenue. *Post* at 419.

Similar to the grant of authority to the Director of Public Works in *Houston Belt*, section 42.2516(h) provides the Commissioner with "some authority" to determine whether a district has excess revenue, but "he does not have authority to make that determination in a way that conflicts with [the statute]." *See Houston Belt*, 487 S.W.3d at 167; *see also* TEX. EDUC. CODE § 42.2516(h) (2006) (allowing the Commissioner to recover excess revenue under the statute "as determined by the commissioner"). Not only does the plurality's reading of the Clawback Provision contradict the statute's plain language, but it also renders the language listing the three categories superfluous and is inconsistent with the principle of *expressio unius est exclusio alterius* —the naming of one or more implies the exclusion of others. *See PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 640 (Tex.2008) (Willett, J., joined by Hecht, J., dissenting). Accordingly, I would hold that by employing categories other than the three specifically listed in section 42.2516(h) to determine "excess revenue," the Commissioner "acted beyond the limits of the discretion he was actually granted," making his actions *ultra vires*. *See Houston Belt*, 487 S.W.3d at 168.

## B

Absent additional language in the relevant statute, *Houston Belt* dictates that the Districts pleaded viable *ultra vires* claims; but section 42.2516 contains a finality provision. That provision plainly states that "[a] determination by the commissioner under this section is *final and may not be appealed.*" TEX. EDUC. CODE § 42.2516(*l* ) (2006) (emphasis added). There was no similar provision at issue in *Houston Belt*. As the plurality notes, we stated in *Houston Municipal Employees Pension System v. Ferrell* that "[t]he words 'final and binding,' when used to describe an administrative decision, preclude judicial review." *Ante* at 413 (quoting *Hous. Mun. Emps. Pension Sys. v. Ferrell*, 248 S.W.3d 151, 158 (Tex.2007)). Similar to the plurality, I find "final and may not be appealed" to be indistinct from "final and binding." Thus, "[a]bsent a conspicuous and irreconcilable conflict" between the Commissioner's actions and his authority under section 42.2516(h), "any further consideration of the matter would impermissibly encroach on the unreviewable, discretionary authority afforded to the [Commissioner] under [section 42.2516]." *See Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 11 (Tex.2015). That standard is necessarily higher than that for pleading an *ultra vires* claim, and, like the plurality, I would not foreclose that standard being met. But as the plurality concludes, there is no such conflict present here. *See ante* at 412–13.

The dissent argues that because the finality provision is limited to determinations made "under this section," and "the Commissioner's determination ... was outside the clawback authority granted to him by section 42.2516(h), his determination was not 'under' section 42.2516," making the finality provision inapplicable. *See post* at 417. But we said in *Houston Belt* that an official can commit an *ultra vires* act when he "mak[es] the type of *determination* which [he] ha[s] authority to

make," but "in a way the law [does] not allow." *See* 487 S.W.3d at 162 (emphasis added) (discussing *City of El Paso v. Heinrich*, 284 S.W.3d 366, 371–78 (Tex. 2009)). Thus, here, while the Commissioner's determination under section 42.2516(h) was *ultra vires*, it was nonetheless a determination under section 42.2516 to which the finality provision applies. Adopting the dissent's interpretation of the finality provision renders it meaningless, as decisions the Commissioner makes within his legal authority are already immune from judicial review. *See Heinrich*, 284 S.W.3d at 372 ("To fall within [the] *ultra vires* exception, a suit … must allege … that [an] officer acted *without* legal authority." (emphasis added)). As the dissent acknowledges, "[i]n construing a statute, we must give effect to each word." *Post* at 419 (citing *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 256 (Tex.2008) ("The Court must not interpret the statute in a manner that renders any part of the statute meaningless or superfluous.")). Therefore, I would read the finality provision as including *ultra vires* acts, but—per *Ferrell* and *Klumb*—not irreconcilably conflicting ones.

\* \* \*

While I would find that the Commissioner acted *ultra vires* by including tax revenues in his determination of excess revenue under section 42.2516(h), I would also find that the finality provision in section 42.2516(*l*) exempts the Commissioner's actions from judicial review except in very limited circumstances which are not applicable here. Accordingly, I concur only in the judgment.

JUSTICE JOHNSON, joined by JUSTICE WILLETT, JUSTICE GUZMAN, and JUSTICE BOYD, concurring in part and dissenting in part.

The parties strongly disagree about whether the Education Code (Code) au-thorized the Commissioner of Education to clawback approximately three million dollars in local property tax revenue from Sterling City ISD, Blackwell CISD, and Highland ISD. Although the plurality broadens the inquiry to essentially include the entire school finance construct, the parties do not do so: they agree that the part of the Code at issue here is former section 42.2516, and more specifically, former subsections 42.2516(h) and (*l*). The Commissioner says that subsection (h) gave him the authority to clawback the revenue in question and subsection (*l*) made his decisions final and unappealable. The School Districts say subsection (h) did not give him the authority he claims; his mandate that the Districts reduce their "excess revenue" was *ultra vires* ; and because his determination lacked a legal basis in subsection (h), subsection (*l*) did not make his determination unreviewable.

The subsections in question provided:

(h) Notwithstanding any other provision of this title, if the amount of state and local revenue per student in weighted average daily attendance for the maintenance and operations of the district available to the district in a school year *as a result of increases to the equalized wealth level under Section 41.002, the basic allotment under Section 42.101, and the guaranteed level under Section 42.302* … exceeds the amount to which a district is entitled under [the target revenue of] Subsection (b) for that school year, the commissioner must:

(1) reduce the amount of state aid provided to the district for that school year by an amount equal to the excess revenue, as determined by the commissioner; or

(2) for a district with a wealth per student greater than the applicable

amount described by Section 41.002(a), require the district to purchase a number of attendance credits for that school year at a cost equal to the amount of excess revenue, as determined by the commissioner.

. . .

(*l*) A determination by the commissioner *under this section* [42.2516] is final and may not be appealed.

TEX. EDUC. CODE § 42.2516(h), (*l*)(emphasis added).[1] The parties agree that the Commissioner's clawback determinations were not made on the basis of any of the three factors specified in subsection (h); rather, they were made on the basis of increased local property tax collections based on sudden and significant increases in property values in the Districts.

The plurality's decision turns in part on the language of subsection 42.2516(*l*), as it should, in light of that subsection's plain language. But in larger part, the plurality's decision turns on the overall concept of the Foundation School Program, as it should not, in light of the plain language of both subsections 42.2516(h) and (*l*). The language of subsection 42.2516(*l*) is clear that determinations by the Commissioner "under" section 42.2516 are unreviewable. But I disagree with the plurality's conclusion that subsection 42.2516(*l*) "broaden[s] the executive's discretion" and vests the Commissioner with unlimited, unreviewable discretion to make clawback determinations outside the authority specified in subsection 42.2516(h). *Ante* at 413. Unquestionably, the Legislature may limit judicial review of the Commissioner's decisions. *See id.* However, in this instance the Legislature specifically limited review only as to a "determination ... under this section." TEX. EDUC. CODE § 42.2516(*l*).

Because the Commissioner's determination in this case was outside the clawback authority granted to him by subsection 42.2516(h), his determination was not "under" section 42.2516. To the contrary, the Commissioner's clawback determination was not authorized by the Code, was *ultra vires,* and was not subject to the limitations in subsection (*l*). For the reasons expressed below, I concur in the dismissal of the claims of Sterling City ISD and Blackwell CISD, as well as dismissal of Highland ISD's claim for amounts it has already paid by purchasing attendance credits. But I dissent from the dismissal of Highland ISD's claim for prospective declaratory and injunctive relief and the claims for attorney's fees as to all parties.

## I. Jurisdiction

This Court has long recognized that when a governmental officer acts *ultra vires*—beyond his granted authority—the unauthorized actions are not acts of the State. *Hous. Belt & Terminal Ry. v. City of Houston,* 487 S.W.3d 154, 161 (Tex.2016) (citing *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 404 (Tex.1997)). An officer acts *ultra vires* for either failing to perform a ministerial act or for exercising limited discretion in conflict with authority granted by a statute authorizing the officer to act. *Id.* We explained in *Houston Belt* that if an official's authority is less than absolute and the official acts outside that limited authority, the acts are *ultra vires. Id.* at 165. To determine whether a grant of authority is absolute or limited, we consider the grant of authority and give effect to the enacting body's intent. *Id.* at 164–65. The question is not whether the granting body intended to grant the official authority to exercise discretion, but rather

---

1. The statutes in effect at the time of this case have since been amended. All references to the Education Code will be to the version in effect at that time. *See* Act of May 12, 2006, 79th Leg., 3d C.S. ch. 5, 2006 Tex. Gen. Laws 45.

whether it intended to grant the official *absolute* discretion. *Id.* at 163–64.

In *Houston Belt*, a City of Houston ordinance gave the Director of Public Works and Engineering authority to determine drainage charges to be imposed on "benefitted properties" based on a specified rate per square foot of impervious surface. *Id.* at 158–59. The ordinance defined "benefitted property" and "impervious surface," and provided that the area of impervious surface "shall be determined on the basis of digital map data ... or other similar reliable data" as determined by the Director. *Id.* Several property owners filed suit claiming the Director acted outside his authority by using the method he did for determining certain properties were benefitted and in determining the amount of impervious surface area of those properties. *Id.* We looked to the language of the ordinance to determine the limits of the Director's authority, keeping in mind that our primary objective in construing an ordinance is to ascertain and give effect to the enacting body's intent. *Id.* at 164–65. As for the Director's determination of which properties were "benefitted properties," we concluded that he had discretion to make the determination, but no discretion to interpret the term in a way contrary to the definition itself. *Id.* at 166–67. The ordinance defined a "benefitted property" as one that discharges into the city drainage utility system. *Id.* at 165–66. The property owners alleged that their properties were not "benefitted" because they did not discharge into the city's drainage system, but rather they discharged into natural bayous that were not within the definition of "drainage system." *Id.* at 167. Construing the pleadings liberally in the property owners' favor, we concluded the property owners alleged an *ultra vires* claim. Further, while the Director had discretion to determine whether the surface was impervious, it was not absolute

discretion because the ordinance mandated the types of data to be used in making that determination. *Id.* at 168. Because the property owners alleged the Director used an unreliable method (aerial photography) to classify their properties as impervious, while the ordinance required the use of digital map data or similar "reliable" data, the pleadings were sufficient to allege a viable *ultra vires* claim with regard to his determination of the impervious nature of their properties. *Id.* at 168–69.

The plurality concludes that subsection 42.2516(*l*) makes the Commissioner's determinations under 42.2516(h) final and unappealable, that is, the Legislature granted the Commissioner complete discretion to make clawback determinations regardless of the basis for the determination. *Ante* at 413. In *Houston Municipal Employees Pension System v. Ferrell*, 248 S.W.3d 151, 158 (Tex.2007), we held that judicial review was precluded where a statute provided a pension board's determinations were "final and binding." But in that case we only addressed the availability of judicial review, not whether the pension board had complete discretion. We did, however, address the issue of the "final and binding provision" on the pension board's discretion in a subsequent case. *See Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1 (Tex.2015).

In *Klumb*, we considered whether courts had authority to review the pension board's actions under an *ultra vires* theory notwithstanding the statutory ban on judicial review. *Id.* at 8. The plaintiffs argued that the Pension System's interpretation of the statutory term "employee" was *ultra vires* because it was in conflict with the plain language of the statute. *Id.* at 9. We concluded that the plaintiffs failed to plead an actionable *ultra vires* claim because the pension board's interpretation did not conflict with the other statutory terms. *Id.* at

10–11. We did not, however, foreclose the possibility that a particular interpretation of the statute *could* be *ultra vires* despite the ban on judicial review. *Id.* at 11. We explained that the board may not violate the statute, but absent "a manifest conflict with statutory terms" or a "conspicuous and irreconcilable conflict," courts could not review the board's actions. *Id.* at 10–11.

The plurality says that the effect of language limiting judicial review such as that in subsection 42.2516(*l*) is to broaden the executive's discretion. *Ante* at 413. But it cites no authority for its statement, suggests no standard for limiting the discretion afforded, and offers no reason to disregard the clear language of subsection 42.2516(*l*) specifying that a determination only "under this section [42.2516]" is final and unappealable. Further, the plurality's statement conflicts with longstanding rules of statutory construction to the effect that we read the plain language of a statute to mean what it says—no more and no less—and that we do not read language into or out of a statute except to avoid absurd or nonsensical results. *See Union Carbide Corp. v. Synatzske,* 438 S.W.3d 39, 52 (Tex. 2014). The plurality's logic is hard to understand. The plurality substantively says that by specifically limiting judicial review of determinations under section 42.2516, the Legislature really intended not what it said, but rather what it did not say—to grant the Commissioner unlimited, unbounded discretion to make clawback determinations not authorized by section 42.2516. *Ante* at 413. And the plurality does not even attempt to justify its reading of language into (or out of, as the case may be) subsections 42.2516(h) and (*l*) as necessary to avoid nonsensical or absurd results.

As relevant to this matter, subsection 42.2516(h) contains two mandates. First,

the Commissioner *must* under certain circumstances either reduce the amount of state aid provided to a district or require the district to purchase attendance credits. Tex. Educ. Code § 42.2516(h). Second, the amount of any reduction or required attendance credit purchases are to be based on increases in the amount of state and local revenue *"as a result of"* increases to three specified subject matters: (1) the equalized wealth level, (2) the basic allotment, and (3) the guaranteed level. *Id.* (emphasis added).

In construing a statute, we must give effect to each word. *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue,* 271 S.W.3d 238, 256 (Tex.2008) ("The Court must not interpret the statute in a manner that renders any part of the statute meaningless or superfluous."). If the three specified factors are to be given effect according to the statutory language, they can only be read to specify what the Commissioner *must* consider, as well as limiting the Commissioner's discretion as to what he *may* consider. Otherwise, the language in subsection (h) "as a result of increases to the equalized wealth level under Section 41.002, the basic allotment under Section 42.101, and the guaranteed level under Section 42.302" is surplusage, that is, it is meaningless and superfluous. *See id.*

Just as the statute did in *Klumb,* subsection 42.2516(h) grants broad discretionary authority to the Commissioner. But even given that broad discretion, the Commissioner may not act outside what has been granted to him. His actions may not create a "manifest conflict" or a "conspicuous and irreconcilable conflict" with the statutory terms granting him the discretion and authority to act. *See Klumb,* 458 S.W.3d at 11. Had the Legislature intended for the Commissioner to have discretion to clawback all excess revenue available to a district, and not just revenue as a result

of increases in the three factors, it could have—and we must presume would have—said so, either by omitting the language the Court's decision makes surplusage, or by specifying the other factors the Commissioner could take into consideration. *See Synatzske*, 438 S.W.3d at 52 (courts must "take statutes as we find them, presuming the Legislature included words that it intended to include and omitted words it intended to omit").

JUSTICE BROWN agrees that the Commissioner's actions were *ultra vires* because subsection 42.2516(h) did not grant him the authority to clawback funds as he did. *Ante* at 414–15 (Brown, J., concurring). Yet JUSTICE BROWN also concludes that (1) there is no "conspicuous and irreconcilable conflict" between the Commissioner's actions and his authority under subsection 42.2516(h), and (2) the lack of such a conflict, together with subsection (*l*)'s provision making the Commissioner's determinations under section 42.2516 final and unappealable, precludes judicial review. *Id.* at 415. However, because the Commissioner's actions in clawing back millions of dollars from the Districts were not authorized by the statute, there is no realistic way to characterize his clawback actions as anything *less* than being in conspicuous and irreconcilable conflict with his statutory authority.

While the plurality's conclusion is essentially that the Commissioner had authority to clawback amounts attributable to any reason whatsoever because the Code did not explicitly prohibit him from doing so, the Commissioner does not argue that his authority is that broad. As the Court recently explained in *Morath v. Texas Taxpayer and Student Fairness Coalition*, 490 S.W.3d 826, 838, 2016 WL 2853868 (Tex.2016), recapture is part of the school finance system which accounts for districts with property wealth exceeding the statu-

tory limit. Those districts are given options to consolidate with another district, detach property, purchase average daily attendance credits, contract for the education of nonresidents, or consolidate their tax base with another district. *Id.* But as the Commissioner posits in his briefing here, and as his Commission-employed expert witness testified at trial, this is not a recapture case. This is a clawback case that turns only on the language of subsection 42.2516(h). The Legislature provided for dealing with property wealth discrepancies, but subsection 42.2516(h) simply does not authorize the Commissioner to deal with it in the manner he did in this case.

Because the Commissioner's decision to clawback several million dollars from the Districts was not a determination authorized by, that is, under, section 42.2516, the Districts' claims were for *ultra vires* acts of the Commissioner for which suit would lie and they were not subject to subsection 42.2516(*l*) for which his determinations would be final and unappealable. But even though I would not dismiss the claims for want of jurisdiction on the basis the Court does, I agree that some of the Districts' claims must be dismissed because they are for retrospective relief, as I explain below.

## II. Retrospective Relief

As we explained in *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 (Tex.2009), even though a suit may allege a viable *ultra vires* claim against a governmental official, the suit is, for all practical purposes, against the State. Therefore, the available remedies are limited because, generally, retrospective monetary claims against the State are barred by immunity. *Id.* at 374. But a judgment that involves payment of money does not always implicate immunity—claims for prospective in-

junctive relief from the date of injunction (even those requiring expenditure of state funds) are permissible. *Id.* However, "the line between prospective and retrospective remedies is neither self-evident not self-executing." *Id.* at 375 (quoting DOUGLAS LAYCOCK, MODERN AMERICAN REMEDIES 483 (3d ed.2002)).

In *Heinrich*, Lilli Heinrich sued the El Paso Fireman & Policemen's Pension Board and others, alleging that her survivor benefits had been reduced in violation of state law. *Id.* at 369. She sought declaratory relief and an injunction to restore her benefits from the date of the violation. *Id.* We concluded that Heinrich's claims for prospective relief could go forward, but dismissed her claims for retrospective relief. *Id.* at 380. And in *Lowell v. City of Baytown*, 356 S.W.3d 499, 501 (Tex.2011), we held that "firefighters' claims for back pay and related damages for improper calculation of pay for assignments performed in the past are the type of retrospective relief that we held barred by governmental immunity in *Heinrich*."

The trial court and court of appeals determined that based on the State's ongoing set of accounting ledgers that included amounts owed to districts by the State and amounts owed to the State by districts, future adjustments to the ledgers to credit the Districts' accounts for the amounts they had been overcharged and for which they had purchased attendance credits did not constitute retrospective relief. 447 S.W.3d 505, 514 (Tex.App.–Eastland 2014). The Commissioner asserts that because Sterling City ISD and Blackwell CISD paid all of the clawback required of them by the Commissioner via purchasing attendance credits, their only remedy is retrospective relief regardless of whether those past damages are repaid through future credits to their account. The Commissioner points out that the relevant part

of the Education Code no longer exists, so the bottom line is no matter how the Districts receive money back or a credit for money they paid, the net effect is they recover retrospective damages. I agree with the Commissioner, at least in part.

The Districts first assert that because the Commissioner did not challenge the trial court's findings that the Districts' injuries are ongoing and the State can adjust monies owing or due without having to pay money damages, those findings are binding on the Commissioner and this Court. They argue that appellate *de novo* review of the trial court's conclusion of law that the relief constituted permissible prospective relief must be conducted on the basis of the uncontested fact findings. However, when appellate courts conduct a *de novo* review, they independently determine each issue and accord the original court's decision no deference. *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex.1998).

The Districts next argue that the Commissioner's assertion that the Districts' claims are barred because they only sought retrospective relief is an affirmative defense that he waived because he failed to request findings of fact to support it. I disagree. A governmental officer's claim that a plaintiff is only seeking retrospective damages is not an affirmative defense. We have treated claims seeking retrospective damages as being barred by immunity from suit—which implicates courts' subject matter jurisdiction—and dismissing the claims. *See Heinrich*, 284 S.W.3d at 380 ("[Heinrich's] claims for prospective declaratory and injunctive relief against the Board members and the mayor in their official capacities may go forward, but we dismiss her retrospective claims against them."); *see also City of Dallas v. Albert*, 354 S.W.3d 368, 379 (Tex.2011) ("Because the Officers sought only retrospective relief, their declaratory judgment claims

must be dismissed."). Therefore, a request for findings of fact was not necessary in order to preserve the issue.

Although relief for an injury that occurred in the past is retrospective relief precluded by the Commissioner's immunity from suit, the Districts argue, and the trial court found, that the Districts' injuries are "ongoing." But I fail to see how they are. The Districts are complaining about a one-time clawback of money that they argue was improperly calculated for past school years. Because the statute has since been amended, these are injuries that occurred in the past and will not reoccur. In Albert, for example, we held that police officers and firefighters were seeking retrospective relief where they alleged that they sustained damages equal to the difference between the amount of their salaries *already paid* and the amount that should have been paid. 354 S.W.3d at 378–79; see Lowell, 356 S.W.3d at 501 ("Here, the firefighters' claims for back pay and related damages for improper calculation of pay for assignments *performed in the past* are the type of retrospective relief that we held barred by governmental immunity in Heinrich." (emphasis added)).

We explained in Heinrich that "under federal immunity law, claims for prospective injunctive relief are permissible, while claims for retroactive relief are not," and concluded that "a claimant who successfully proves an *ultra vires* claim is entitled to *prospective injunctive relief, as measured from the date of injunction.*" 284 S.W.3d at 376 (emphasis added). Here, the Districts requested injunctive relief requiring the Commissioner to comply with subsection 42.2516(h). But because the statute had been amended, the requested prospective injunctive relief was no longer possible. See Tex. Civ. Prac. & Rem. Code § 65.011 ("A writ of injunction may be granted if ... the applicant is entitled to

the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant....").

In addition to determining that the Districts' damages were ongoing, the trial court and court of appeals also concluded that no payment of damages was required because the State and the Districts had an ongoing financial relationship that permitted the State to adjust amounts owed to or due from the Districts to remedy the damages. 447 S.W.3d at 514. I disagree that this remedy would not in substance involve the payment of money damages. We noted in Heinrich that prohibiting retrospective relief was consistent with the modern justification for immunity, that is, protecting the public fisc. 284 S.W.3d at 375. The immunity doctrine leaves it to the Legislature to determine when tax resources should be shifted from their intended use to pay money judgments. Brown & Gay Eng'g, Inc. v. Olivares, 461 S.W.3d 117, 121 (Tex.2015). Even though the judgment in this case did not require a money payment to the Districts, it required the shifting of state resources from their intended use to satisfy the judgment based on past activities. This was, in substance, prohibited retrospective relief. See Scott v. Alphonso Crutch Life Support Ctr., 392 S.W.3d 132, 139 (Tex.App.–Austin 2009, pet. denied) ("To the extent any relief ... would result in repayment by the Commissioner of past amounts withheld from the School, these claims would result in retroactive relief that is barred by sovereign immunity in accordance with Heinrich.").

The Districts also cite City of Round Rock v. Whiteaker, 241 S.W.3d 609, 634–35 (Tex.App.–Austin 2007, pet. denied), where the court of appeals stated this Court has historically recognized that "suits to recover money or other property wrongfully taken or withheld by state officials from

their rightful owners do not implicate sovereign immunity because, in concept, the disputed property never belongs to the state." But the court made the statement in the context of equitable claims for back pay for work that had already been performed, which is not the situation here.

I would hold that the Districts' claims to recover the money clawed back from them are for retrospective relief and must be dismissed. However, as the Commissioner acknowledges (subject to his jurisdictional challenge), Highland ISD's claims for prospective injunctive relief regarding amounts it has not yet paid are not barred. Accordingly, I would remand that claim to the trial court for further proceedings.

### III. Attorney's Fees

The trial court awarded attorney's fees jointly and severally to the Districts. In a declaratory judgment proceeding, a court "may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE § 37.009. Because I would hold that the Districts asserted viable *ultra vires* claims but, contrary to the judgment of the trial court, their payments to the State could not be recovered, and Highland ISD's claims are not entirely barred, I would remand the issue of attorney's fees to the trial court for it to consider whether an award is still equitable and just, and if so, in what amount. *See City of Lorena v. BMTP Holdings, L.P.*, 409 S.W.3d 634, 646 (Tex.2013).

### IV. Conclusion

I concur in dismissal of the claims of Sterling City ISD and Blackwell CISD, as well as Highland ISD's claim for amounts it has already paid by purchasing attendance credits. But I dissent from the dismissal of Highland ISD's claim for prospective declaratory and injunctive relief and the claims of attorney's fees as to all parties. I would remand those claims to the trial court for further proceedings.